## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Natalie Chang, Irene Scott, Jeana Graham, Jane Doe, Gian Libot, Mary Roe, and Rebecca Chol Nygundeng, on behalf of herself and her three minor children, M., E., and G., | **Civil No.  21-cv-1821** |
| *Plaintiffs*, c/o Hausfeld LLP, 888 16th Street N.W., Suite 300, Washington, DC 20006 | **JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE** |
| v. | |
| The Republic of South Sudan and South Sudan Ministry of Defence and Veteran Affairs, | |
| *Defendants*. | |

## COMPLAINT FOR ASSAULT, BATTERY, WRONGFUL DEATH, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND NEGLIGENT RETENTION, TRAINING, AND SUPERVISION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ......................................................................................... 6

PLAINTIFFS ....................................................................................................................... 6

DEFENDANTS ................................................................................................................... 8

FACTS ................................................................................................................................. 9

I.   Background: independence and civil war. ............................................................ 9

    A.   The Republic of South Sudan gains independence. ................................. 9

    B.   The civil war. ........................................................................................ 10

II.   The Terrain attack of July 11, 2016. ................................................................... 14

    A.   Violence spreads across South Sudan's capital Juba................................. 14

    B.   The SPLA storms the Terrain Hotel. ...................................................... 15

    C.   Natalie Chang's ordeal. .......................................................................... 18

    D.   Irene Scott's ordeal ................................................................................ 22

    E.   Jeana Graham's ordeal. .......................................................................... 25

    F.   Jane Doe's ordeal. .................................................................................. 27

    G.   Mary Roe's ordeal.................................................................................. 29

    H.   John Gatluak's ordeal.............................................................................. 31

I.      Gian Libot's ordeal. ............................................................................... 32

J.      The Government  orders the halt of the Terrain Attack only after the United
        States urges it to act. ............................................................................ 34

III. The Government admits fault in two fact-finding missions and a court martial. ............ 35

A.      South Sudan's official Investigation Committee and a United Nations mission
        both pin the attack on the Government. ............................................... 35

B.      The SPLA General Court Martial finds the Ministry of Defence responsible for
        the attack and civilly liable to compensate the victims. ........................................ 38

IV. The Government thwarts the victims' efforts to seek justice and fair compensation. ...... 40

A.      The Government spoliates evidence and obstructs an appeal. .............................. 40

B.      After destroying the case file, the Government induces the victims to negotiate
        out of court, strikes a deal with a fraudster, and then fails to make good on
        promises to pay. .................................................................................. 40

V.  South Sudan waives immunity and consents to this lawsuit. ............................................ 43

GENERAL ALLEGATIONS ............................................................... 44

I.  Equitable estoppel and tolling. ........................................................................ 44

II.  Respondeat superior. ..................................................................................... 46

COUNT ONE ............................................................................................ 47

COUNT TWO ........................................................................................... 49

COUNT THREE ....................................................................................... 50

COUNT FOUR ......................................................................................... 50

COUNT FIVE ................................................................................................................. 52

PRAYER FOR RELIEF ................................................................................................. 53

Plaintiffs Natalie Chang, Irene Scott, Jeana Graham, Jane Doe, Gian Libot, Mary Roe, and Rebecca Chol Nygundeng, on behalf of herself and her three minor children, M., E., and G., allege as follows:

## INTRODUCTION

1.　　On July 11, 2016, armed forces of the Republic of South Sudan ("South Sudan" or "Government") committed one of the worst attacks on U.S. and international aid workers in recent history, deploying rape as a weapon of terror. Fifty to one hundred soldiers from the Sudan People's Liberation Army ("SPLA") gang-raped, tortured, pillaged, and shot civilians in a coordinated assault on a humanitarian aid compound called the Terrain Hotel ("Terrain Attack"). [1] Plaintiffs Natalie Chang, Irene Scott, Jeana Graham, Jane Doe, Gian Libot, Mary Roe, and decedent John Gatluak Manguet Nhial ("John Gatluak") were among the victims.

2.　　At the time of the attack, Plaintiffs and John Gatluak were employees of Internews, an American non-governmental organization that used the Terrain Hotel as its residence in South Sudan. Internews ran international development programs to support an independent media in South Sudan, operating under a contract with the United States Agency for International Development ("USAID") and a bilateral agreement between the United

---

[1] The Terrain compound included a residential area and the premises of a construction company of the same name. The compound is commonly referred to as the "Terrain Hotel" in media reports.

States and South Sudan. Internews is a non-profit corporation incorporated under the laws of California. On information and belief, Internews is almost entirely funded by the United States government and is an instrumentality through which the United States government promotes foreign policy and international development.

3.      The attackers were agents of South Sudan's armed forces, including the elite Presidential Guard, National Security Service ("NSS"), and regular SPLA divisions. These units were agencies of South Sudan, subordinate to the Ministry of Defense, and acting under actual or apparent authority, or color of law, of South Sudan. South Sudan's armed forces committed the Terrain Attack as part of a nation-wide pattern and practice of weaponizing rape to terrorize perceived opponents. Through this pattern and practice, the Ministry of Defense sanctioned sexual violence and pillage as forms of compensation to its underpaid, underfed, and undertrained soldiers.

4.      Defendants' forces subjected Natalie Chang, Irene Scott, Jeana Graham, Jane Doe, and Mary Roe to horrific gang-rape and other forms of sexual violence at the barrel of AK-47s, as well as beatings and threatened executions. The Government forces executed journalist and Internews employee John Gatluak with point-blank gunshots to his head and body. Rebecca Chol Nygundeng, John Gatluak's widow, was forced into premature labor as a result of the shocking and stressful news of her husband's death; all three of her children have been left fatherless as a result of the Terrain Attack. Gian Libot, also an aid worker for

2

Internews, survived a rifle-butt beating and was forced to watch the summary execution of his friend and colleague John Gatluak.

5.      The Terrain Attack lasted for nearly five hours. Defendants only ordered their troops to call off the attack after urgent appeals from the United States embassy in Juba. Although the Government eventually evacuated Natalie, Jeana, Jane Doe, and Gian from the compound, they left Irene, Mary, and others behind to endure an all-night ordeal of terror.

6.      Beginning in or around August 2016, Defendants induced the Plaintiffs and other victims to seek judicial remedies as witnesses and claimants in South Sudan, first through a governmental Investigation Committee and then through the SPLA General Court Martial.

7.      On September 6, 2018, the court martial convicted 10 "SPLA personnel" of "murder, criminal trespass, theft after preparation made for causing death, hurt or restrain in order to facilitate the committing of the theft, house breaking, Sexual harassment [sic], rape, [and] Assault [sic]."[2] The court martial specifically held that the Ministry of Defense was civilly liable to Plaintiffs and other victims, ordering the Government to pay more than US $2 million in damages to the owner of the Terrain Hotel for property damage, but only $4,000

---

[2] Exhibit A, Government of South Sudan/Sudan People's Liberation Army vs. S/M. Abraham Agany Tiah Dhuor et al., Judgment, Criminal Case No. 135/2017, SPLA General Court Martial, at 3. A true and correct mobile-phone photo of the judgment is attached to this Complaint.

each to Natalie, Jeana, Irene, and one other victim of sexual violence. The court martial only awarded 51 cows to the heirs of John Gatluak. Plaintiffs appealed the damages portion of the judgment, arguing that the compensation was incommensurate with the depravity of the crimes and the severity of their injuries.

8.    The Government, however, obstructed the appeal. Having induced Plaintiffs to seek legal compensation in South Sudan, the Government thwarted their efforts to do so through the intentional, or grossly negligent, destruction of the case file. The Supreme Court of South Sudan was unable to hear their appeal because the case file—the entire record of evidence and rulings—had disappeared after being transferred to the custody of the office of the President of the Republic.

9.    Defendants profited from their spoliation. From the fall of 2019 through June 2021, Defendants induced the Plaintiffs and other victims to negotiate an out-of-court settlement. South Sudan represented to the United States that it would compensate the victims, assuring the goodwill of its principal international donor. The Government, however, has repeatedly negotiated in bad faith. In or around the winter of 2020, South Sudan negotiated a fraudulent "settlement" with a local lawyer who had no power of attorney to represent the Plaintiffs. Aware of the fraud, South Sudan persisted in attempting to bind Plaintiffs to terms secured by Defendants without Plaintiffs' knowledge or consent. Abandoning hope, Irene decided to accept Defendants' offer of inadequate compensation in

August 2020. But nearly one year later, Defendants have failed to pay her what was promised. Nearly five years after the attack, South Sudan has not paid *any* compensation to *any* of the victims of rape and other violence—not even the meager damages of $4,000 or 51 cows.

10.     Realizing that South Sudan had lured the victims into protracted negotiations, without making good on promises to pay, Plaintiffs informed South Sudan of their intent to bring claims in the United States. On Monday, March 22, 2021, Counsel for Plaintiffs delivered a demand letter and a draft complaint to Counsel Biong Pieng, Advocate General of South Sudan. Plaintiffs' draft complaint alleged that South Sudan had waived its sovereign immunity through its assumption of liability. Counsel Pieng confirmed receipt via WhatsApp.

11.     On April 6, 2021, Counsel Pieng informed Plaintiffs' local counsel in South Sudan that the Plaintiffs should bring their claims so that the case can be resolved. On June 26, 2021—three months after receiving the draft complaint and Plaintiffs' assertion that South Sudan had waived immunity and consented to suit—the Legal Adviser to Salva Kiir, the President of South Sudan, reiterated to Plaintiffs' local counsel that Plaintiffs should bring their claims.

12.     South Sudan's response to Plaintiffs' demand letter—repeated invitations to bring their claims—constitutes a waiver of sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(1). Plaintiffs now bring claims for assault,

battery, wrongful death, intentional infliction of emotional distress, and negligent retention, training, and supervision.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over Plaintiffs' claims against the Republic of South Sudan and its agency, the Ministry of Defence and Veteran Affairs, under the FSIA, 28 U.S.C. §§ 1330(a) and 1605(a)(1), because South Sudan has waived immunity, as alleged in paragraphs 10-12 and 128-132.

14.     This Court has personal jurisdiction over Defendant South Sudan under the FSIA, 28 U.S.C. § 1330(b).

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(f)(4).

## PLAINTIFFS

16.     Plaintiff Natalie Chang is a U.S. citizen. At the time of the Terrain Attack, she was employed by the American NGO Internews, on a mission to promote the free press in South Sudan under a USAID contract and bilateral agreement with the United States.

17.     Plaintiff Irene Scott is an Australian citizen. At the time of the Terrain Attack, she was employed by the American NGO Internews, promoting community engagement in South Sudan under a USAID contract and bilateral agreement with the United States.

18.     Plaintiff Jeana Graham is a U.S. citizen. At the time of the Terrain Attack, she was employed by the American NGO Internews, on a mission to promote the free press in South Sudan under a USAID contract and bilateral agreement with the United States.

19.     Plaintiff Jane Doe is a U.S. citizen. At the time of the Terrain Attack, she was employed by the American NGO Internews, on a mission to promote the free press in South Sudan under a USAID contract and bilateral agreement with the United States.

20.     Plaintiff Gian Libot is a citizen of the Philippines. At the time of the Terrain Attack, she was employed by the American NGO Internews, on a mission to promote the free press in South Sudan under a USAID contract and bilateral agreement with the United States.

21.     Plaintiff Mary Roe is a citizen of Nepal originally from the Philippines. At the time of the Terrain Attack, she was employed by the American NGO Internews, on a mission to promote the free press in South Sudan under a USAID contract and bilateral agreement with the United States.

22.     Plaintiff Rebecca Chol Nygundeng is a citizen of South Sudan. She brings this action on behalf of herself and her three children. At the time of the Terrain Attack, her husband, John Gatluak, was working for the American NGO Internews, on a mission to promote the free press in South Sudan under a USAID contract and bilateral agreement with the United States. John was deeply committed to building democracy in South Sudan through a free press: "Being a journalist in South Sudan is risking one's life," he stated in an interview

with Internews. "But I have dedicated myself to serving my community through radio as a watchdog, informing them about what the politicians are doing once the citizens elect them to power."[3]

## DEFENDANTS

23.     Defendant the Republic of South Sudan became an independent nation state on July 9, 2011.

24.     Defendant the Ministry of Defence and Veteran Affairs is an agency of the Republic of South Sudan.

25.     At all relevant times, the perpetrators of the Terrain Attack were agents of the Republic of South Sudan and the Ministry of Defence and Veteran Affairs, acting within their scope of employment and under the actual or apparent authority, or color of law, of the Defendants.

26.     At all relevant times, Defendants were principals exercising control over the perpetrators of the Terrain Attack, who were members of the SPLA or National Security Service under a chain of command that included:

　　　a.   Kuol Manyang Juuk, Defence Minister

　　　b.   David Yau Yau, Deputy Defence Minister;

---

[3] Internews, In Memory of John Gatluak Manguet Nhial, July 13, 2016, https://internews.org/memory-john-gatluak-manguet-nhial/.

c.  Paul Malong, Army Chief of Staff;

d.  General Gabriel Jok Riak, Deputy Army Chief of Operations;

e.  General Marial Chanuong Yol Mangok, commanding officer of the SPLA Tiger Unit; and

f.  Lieutenant General Akol Koor, Director of National Security of South Sudan and head of the National Security Service;

## FACTS

I.  **Background: independence and civil war.**

  A.  **The Republic of South Sudan gains independence.**

27.  In 2011, the southern Sudanese population voted in a referendum to secede from Sudan after almost 40 years of civil war between the Sudanese government and southern insurgents. After independence, however, the Republic of South Sudan remained devasted by the long civil war and armed conflict that had impacted the area, hindering the development of basic infrastructure, human capital, and formal civilian institutions. Humanitarian needs persisted despite an abundant supply of natural resources, such as oil fields. High levels of corruption also hampered post-independence progression and development.

28.  In December of 2013, political tensions erupted among key South Sudanese leaders throwing the new Republic into violence. The political dispute, although not based on ethnic identity, overlapped with preexisting ethnic and political grievances, triggering armed

9

clashes and ethnic killings in the capital of Juba and beyond. Notably, President Kiir accused his former vice president Riek Machar of plotting a coup to overthrow his administration. Hundreds of civilians died in the ensuing attacks, including attacks on Machar's ethnic group, the Nuer. Retaliatory violence spread, including killings targeting Kiir's ethnic group, the Dinka. The political conflict set in motion mass displacement.

29.     The fighting continued throughout 2013 and 2014. While the warring parties periodically committed to a cessation of hostilities, they also repeatedly violated such deals. Armed groups targeted civilians along ethnic lines, committed rape and sexual violence, destroyed property and looted villages, and recruited children as rebel soldiers.

30.     In April 2016, while armed conflict continued, both sides finally came together to form a new Transitional Government of National Unity ("TGNU"). As a result, former vice president Machar—now the leader of the splinter group Sudan People's Liberation Movement-in-Opposition ("SPLA-IO")—returned to Juba to assume his new post of First Vice President, and a new cabinet was formed under a power-sharing agreement. Nonetheless, efforts to get the parties to demilitarize the capital failed, and as many as 10,000 or more Government forces remained in and around Juba.

**B.  The civil war.**

31.     The TGNU's formation did not end the war. Violence around Wau—one of the country's largest cities—located in Western Bahr el Ghazal, and in parts of the greater

10

Equatoria region caused mass displacement. Local communities in the Equatoria region accused the army and allied militia of land grabs, looting, predatory attacks on civilians, and extrajudicial killings of perceived opposition supporters.

32.     By 2016, at least 50,000 people had been killed as a result of the conflict. But experts have opined that the toll may be much higher, with more than 2.7 million people in South Sudan having been displaced internally.

33.     In October of 2015, President Kiir issued a decree dividing the country's 10 states into 28, a move which exacerbated tensions. The formation of new boundaries altered the states' ethnic balance and intensified local competitions over land and resources.

34.     Civilians were deliberately and systemically targeted during the outbreak of violence in South Sudan by armed forces and groups, including the SPLA and SPLA-IO, as well as groups aligned with them, starting in 2013. Individuals, especially those of the Nuer ethnicity, were killed, arrested or detained arbitrarily, or sexually abused. SPLA soldiers and the militias associated with them carried out attacks on villages, burning down homes, killing and raping civilians.[4] SPLA soldiers were also responsible for numerous cases of killings,

---

[4] United Nations Report of the Commission on Human Rights in South Sudan (A/HRC/34/63) (27 Feb.-24 Mar. 2017), at ¶ 25 ("U.N. 2016 Report").

torture, rape, and beatings in Western Equatoria, Central Equatoria, Upper Nile State, and central and southern Unity State.[5]

35.    In 2016, the U.S. State Department reported that human rights violations committed by the South Sudanese government's military, security, and militia forces included extrajudicial killings, abuse, mass displacement of civilians, intimidation and inhumane treatment of civilians such as arbitrary arrest and detention, abductions and kidnapping, recruitment and use of an estimated 16,000 child soldiers, and conflict related sexual violence.[6]

36.    In particular, violence against women has been widespread and a "consistent characteristic of the conflict in South Sudan."[7] The U.S. State Department reported that rape and gang rape of women and young girls by soldiers in uniform was widely used as a weapon of war.[8]  In July 2016, UN Mission in South Sudan ("UNMISS") documented 217 cases of rape in Juba *alone*, including gang rape, committed at Government checkpoints set-up across the city and during house-to-house-searches by SPLA soldiers.[9] A January 2017 report published

---

[5] *Id*. at ¶¶ 26-31.

[6] U.S. State Department, *South Sudan 2016 Human Rights Report*, at 3 ("U.S. 2016 Report"), https://www.state.gov/wp-content/uploads/2019/01/South-Sudan-1.pdf.

[7] U.N. 2016 Report, at ¶ 34.

[8] U.S. 2016 Report, at 14.

[9] U.N. 2016 Report, at ¶ 35; *see also* U.S. 2016 Report, at 14 (noting that U.N. monitors described groups of armed men going house-to-house in the Jebel neighborhood of Juba, looting and raping—reporting more than 100 separate cases of sexual violence and rape of unarmed civilians).

by the UNMISS and the UN Office of the High Commissioner on Human Rights ("OHCHR") underscored that sexual violence during the Juba conflict had been mainly perpetrated by the SPLA and SPLA-IO, armed groups aligned to them, members of the National Security Services, and the South Sudanese police.[10] Moreover, a survey conducted by the United Nations Population Fund found that 72 percent of women had reported having been raped since the conflict in South Sudan broke out—a majority of those cases committed by police or soldiers—and 75 percent of women had been forced to watch others being sexually violated.[11]

37.     The outbreak of the South Sudanese civil war also resulted in more frequent attacks on humanitarian aid workers, resulting in the deaths of at least 67 aid workers from December 2013 through early 2017.[12] Between January to November 2016, 831 humanitarian incidents were reported, which included assaults, ambushes, and armed attacks on aid workers throughout South Sudan.[13]

38.     In January of 2016, a United Nations Panel of Experts found that President Kiir "and a narrow circle of senior individuals in the military and security services … are waging

---

[10] U.N. 2016 Report, at ¶ 35.

[11] *Id*. at ¶ 35.

[12] *Id*. at ¶ 23.

[13] *Id*.

an aggressive war involving the targeting of civilians and extensive destruction of communities."[14]

## II.   The Terrain attack of July 11, 2016.

### A.  Violence spreads across South Sudan's capital Juba.

39.     The days leading up to the Terrain Hotel attack on July 11, 2016, were laden with violence and city-wide terror.

40.     On July 7, 2016, a clash erupted between units of the SPLA-IO and Government SPLA forces further escalating tensions in the capital of Juba. In one incident, two United States embassy vehicles carrying seven American nationals sustained heavy gun fire from Government forces at a roadblock.

41.     On July 8, 2016, fighting broke out between President Kiir's forces, the SPLA, and Vice President Machar's forces, the SPLA-IO, during a press conference held by the two leaders. The gunfire led to a city-wide battle during which the SPLA used heavy weaponry and helicopter gunships to attack SPLA-IO cantonment sites.

42.     On July 10, 2016, fighting again broke out and quickly spread across Juba. Over the next day, violence reportedly intensified in parts of the capital, including in an area near the U.N. base that sheltered more than 28,000 civilians and U.N. staff. The U.N. site, near both

---

[14] Lauren Ploch Blanchard, *Conflict in South Sudan and the Challenges Ahead*, Congressional Research Service (Sept. 22, 2016), at 14.

an army base and a major cantonment site for opposition forces, sustained artillery fire and mortar rounds, killing several civilians inside the U.N. site, wounding U.N. staff, and killing two Chinese peacekeepers.

43.     As the violence threw Juba into chaos, Vice President Machar and his SPLA-IO soldiers were militarily overwhelmed by the SPLA. The defeat of the SPLA-IO led the SPLA to declare ceasefire in the afternoon of July 11. At about the same time, SPLA soldiers— including members of President Kiir's own protection force—began looting and ransacking civilians.

**B.  The SPLA storms the Terrain Hotel.**

44.     At around 3:30 p.m. on July 11, approximately 50 to 100 Government soldiers attacked the Terrain Hotel compound. The SPLA Tiger Division and regular SPLA soldiers, as well as members of the national police and the National Security Service ("NSS"), broke through the compound's entrance. The invading soldiers eventually forced their way into Terrain's restaurant building and parking lot, vandalizing property, looting possessions, and stealing cash as well as 18 vehicles.



45.     Meanwhile, another group of SPLA soldiers forced their way into Terrain's residential area. The SPLA deliberately targeted the New Apartments Block—also known as the "safe house"—a two story apartment building that housed foreign civilians. Seeking to gain entrance into the two-story safe house, the soldiers attempted to break in by firing at the entrance's bullet proof door and the walls of the building, causing the occupants to hide in fear of stray bullets. While some soldiers continued to attempt entrance through the front door, others climbed the building and started firing at the roof to gain entrance by another means.

46.    Inside the building and beset with fear, the residents of the safe house, including

Plaintiffs, tried to hide and stay quiet. Some hid in locked rooms, while others sought shelter

wherever they could.

47.    After an hour of shooting at the safe house, the soldiers managed to enter the

building. They violently raided the rooms, ransacked and looted all possessions in sight, and

sexually assaulted, raped, and gang-raped international aid workers and several of Terrain's

East African and South Sudanese female staff. Nearly every civilian present on the Compound

at the time of the attack was subjected to physical abuse and torture.



48.    Through the course of the soldiers' looting spree, "not a single structure on the compound was left untouched,"[15] with beds, sinks, lights, and power sockets being systemically removed and transported away by vehicle, in what witnesses described as a visibly coordinated operation to loot and remove the Compound's contents.



**C.  Natalie Chang's ordeal.**

49.    At around 3:30 p.m. on July 11, 2016, Natalie Chang was on the second floor of the safe house of the Terrain Hotel when she learned of an imminent attack. Trying to find a hiding place, Natalie crawled on her stomach through the hallway into a bedroom, seeking shelter in a bathroom with eleven other terrified victims.

---

[15] South Sudan, *Government of South Sudan: Official Report of the Investigation Committee on the Terrain Hotel Incident of 11 July 2016*, (Jan. 11, 2017), https://paanluelwel.com/2017/01/11/govt-official-report-of-the-investigation-committee-on-the-terrain-hotel/.

50.     For the next two hours, SPLA forces made their way into the building, looting, ransacking, and terrorizing everyone in sight. From her hiding spot, Natalie heard metal tearing, glass breaking, and occasional gunshots. She listened as the SPLA soldiers discovered her colleagues down the hall and demanded cash, phones, computers, and other valuables. They threatened to kill anyone who did not comply. She feared for her life as the horrific sounds grew closer.



51.     The SPLA forces eventually made their way to the door of the room where Natalie was hiding. The attackers tried to break down the locked door, yelling threats at the occupants. They began shooting through the door, wounding Jesse Bunch, an American aid worker, in the leg.

52.     The attackers finally broke down the door and discovered Natalie and the other civilians hiding in the bathroom. The attackers aimed their guns at them, shouting "Do you want to die?"

53.     A soldier grabbed Natalie and pulled her out of the bathroom. She was led into a crowd of SPLA soldiers who filled the bedroom. One uniformed soldier shouted at her, smashed her eyeglasses, and threw them to the ground. He started brutally groping her, at first searching her body for valuables, and then painfully pinching her breasts and genitals. The soldier ripped her clothing, leaving a large, deep bruise on her right breast. He then ordered her to sit down on the bed.

54.     Another uniformed man approached her, tore down her clothes and forced her to lie down. He attempted to rape her within the view of multiple uniformed men in the room. During the assault, Natalie saw another soldier sexually assault a woman on the floor while she pleaded for mercy.

55.     When the soldier on top of Natalie finished his assault, she attempted to dress herself. But then another soldier ordered her to disrobe, forced her legs apart, and raped her while other soldiers watched.

56.     After the second rapist ceased his assault, she replaced her clothes and made for the exit. She was stopped by another soldier, however, who forced his tongue in her mouth.

Yet another soldier ordered her into another room, where he directed her into the bathroom, forced her to disrobe and sexually assaulted her.

57.     After this third assault, Natalie made her way into the hall, where she saw a uniformed soldier directing her and other colleagues to gather in a room. This soldier led Natalie and other aid workers out of the building, where they were loaded into a vehicle and brought to the NSS headquarters. About one hour later, Natalie and colleagues were driven to another compound where they were reunited with other victims who had left Terrain earlier in the attack.

58.     The Government destroyed Natalie's life. The attack inflicted severe physical injury and pain on Natalie, along with intense trauma, fear, and anguish. In the year following the attack, her physical recovery required a series of medications and surveillance to monitor the development of infections and disease resulting from the multiple sexual and physical assaults. She took a leave of absence from her work, and upon return to work for Internews, began psychotherapy treatment in an attempt to alleviate the emotional distress associated with traumatic memories of the attack. The impact on her professional career and trajectory was profound. Natalie considered her work for the NGO in South Sudan "a dream job," a culmination of seven years of career progression in the international development sector, and she aspired to stay in South Sudan for several years to contribute to media and humanitarian projects.

21

59.     Following the Terrain Attack, Natalie was unable to return to South Sudan due to fears over retribution, her life and safety, and she has not left the United States for work due to severe post-traumatic stress disorder. Her incapacity to work in field projects ended her career as a thriving international development professional and manager, and with significant financial repercussions, she left the sector completely to pursue a new career path. To this day, Natalie endures psychological and emotional scars from the attack which impair her personal and professional relationships. She continues to seek therapy for recovering from sexual trauma and abuse.

60.     The Government inflicted further trauma on Natalie through its demeaning and deceptive handling of the court martial and its protracted and futile compensation negotiations.

**D. Irene Scott's ordeal.**

61.     After seeing soldiers scaling the balcony, Irene hid in a bathroom with Mary Roe and two males.  Sitting in the shower, Irene heard soldiers smashing up and looting apartments. Eventually, soldiers burst into the bathroom. They demanded that the captives stand up and hand over their phones and led them out of the bathroom.

62.     Around this time, Irene saw John Gatluak run out of a room and try to escape. Soldiers caught him and started kicking him and beating him with a rifle as he lay on the ground in front of Irene. Eventually, Irene was moved into another bedroom where soldiers

forced her to gather cash, laptops, and other valuables for them. The soldiers told her that they had killed "that Nuer"—John Gatluak's ethnicity—and an American and Canadian colleague.

63.     As more soldiers stormed into the building, one grabbed Irene and pulled her into a bathroom. He put a gun to her head and threatened to kill her if she did not comply. Then he raped her. He was the first. Many more would follow. Irene was held captive in that room, beaten, and continually raped by Government forces for hours. Older soldiers forced younger ones to participate in the assault. She was violently raped by at least 12 soldiers in this room. Irene feared she would be killed at the end of it.

64.     After enduring hours of repeated sexual violence, Irene was eventually taken to a downstairs room where she was raped again by a further 3 soldiers. During the ordeal, another women was also brought into the room and raped in front of her.

65.     By the time her assailants left, the sun had set. She and another woman found themselves alone in an empty, dark, and desolated building. They crawled to a bathroom and closed the door to hide from any remaining looters. Both women had their phones stolen and had no way to contact anyone for help. Throughout the night they could hear people moving throughout the compound and feared they would be discovered and shot.

66.     At dawn, they left the building and saw the body of their friend and colleague John Gatluak. They covered the body with a clean sheet out of respect. Upstairs they reviewed

the damage to the building and saw that every room had been smashed and belongings were strewn everywhere. At the front of the building an Internews vehicle stood with its windows smashed in. Soon after they encountered Mary and a Terrain staff member, who informed them that nearly every international resident had been evacuated from the compound the day before and that they and several other terrain staff had been left behind. They feared that now that the sun was up, the soldiers could return at any moment to complete their looting. Eventually a private security contractor arrived to rescue Irene and the other survivors.

67.     The Government's attack on Irene subjected her to profound physical and emotional suffering. The violent sexual assault and torture caused severe internal and external bruising. The ordeal caused Irene to live in fear of an unwanted pregnancy or sexually transmitted disease. To this day, she suffers from continuous and catastrophic PTSD, experiencing anxiety, depression, disrupted sleep, ongoing nightmares, lethargy due to stress, abdominal and chest pain from stress and tension, a reduced capacity to work, strained relations with friends and family, and the impaired ability to maintain personal relationships and intimacy. She has an ongoing fear of being alone at night.

68.     Irene's capacity to work as international development professional has been significantly limited as a result of her injuries. She is unable to continue in her field work or access higher paid positions in high-risk environments.

69.     The Government inflicted further trauma on Irene through its demeaning and deceptive handling of the court martial and its protracted and futile compensation negotiations.

**E.  Jeana Graham's ordeal.**

70.     During the attack on the Terrain Hotel, Jeana took shelter in the same bathroom as Natalie. She remained hidden as soldiers began looting the victims at gunpoint, stealing her computer and backpack.

71.     The soldiers attempted to break down the door to the bathroom. They eventually began shooting at the lock on the door, spraying bullets into the room. Jeana watched in terror as a colleague frantically tried to call UNMISS as bullets shot past him indiscriminately. The gunfire struck Jeana's colleague Jesse Bunch in the leg. The victims opened the door to the bathroom because Mr. Bunch was seriously injured. The soldiers then directed the victims to exit the bathroom. Jeana was the last one remaining in the bathroom. Before she could leave, a soldier put a gun to her head while she knelt on her knees in the shower. He told her he was going to kill her and ordered her to hand over her cell phone. She replied that she had nothing on her.

72.     Two soldiers made her stand up at gun point and searched her body for valuables. They brutally grabbed her breasts and private parts, putting their hands down her

pants. One soldier forced his fingers into her vagina. When she struggled, both soldiers beat her in the face with their hands.

73.     Jeana was led out of the bathroom and eventually brought outside of the safe house. In horror, she saw the body of local journalist and her work colleague John Gatluak, who had been shot in the head. The soldiers forced the victims to line up against a wall. Jeana feared that they were about to be executed. She was eventually transported to the NSS headquarters and released from custody.

74.     The Government caused immense suffering to Jeana. The attack inflicted severe physical injury and pain, along with intense trauma, fear, and anguish. To this day, she suffers severe post-traumatic stress disorder, with depression, anxiety, and somatic symptoms. She is plagued with night terrors and haunted by these events daily. Her trauma continues to require intensive psychological treatment. It has substantially interfered with her marriage and other personal relationships, and prejudiced her quality of life, making her fear crowds, public spaces, and loud noises. Jeana's ordeal has limited her ability to work and side-tracked a thriving career as an international development professional.

75.     The Government inflicted further trauma on Jeana through its demeaning and deceptive handling of the court martial and its protracted and futile compensation negotiations.



**F.  Jane Doe's ordeal.**

76.    Jane Doe was sheltering in the safe house during the Terrain Attack. SPLA soldiers eventually found her hiding in a bathroom and stole her phone. They dragged her out of the bathroom and into Mary's room, where Gian was still hiding under the bed. The soldiers ordered her to give them her money and personal property, and she complied.

77.    Several minutes later, a second group of SPLA soldiers breached the safe house and found Jane Doe. They demanded valuables and she gave them whatever she could find in the room. Growing increasingly angry, the soldiers led her at gunpoint from room to room in search of valuables.

78.    One soldier pushed Jane Doe into a bedroom and demanded valuables, but she had nothing left to give. Enraged, the soldier shoved his hands down her pants. He forced her

onto a mattress on the floor and ordered her to disrobe. He groped and sexually assaulted her, while other soldiers watched.

79.     After this first assault, another soldier grabbed Jane Doe and forced her into yet another bedroom. Discovering that she no longer had any valuables, he slammed the door shut and shouted "I will kill you" and then "Get down on the floor." He aimed his AK-47 at her. Terrorized, she removed her clothes. He then raped her. After the assault, he ordered her to stay put while he went to summon other soldiers. Jane Doe managed to dress herself and slip out of the room.

80.     As she was walking down the stairs, a soldier put his arm around her and led her to the exit of the building. As she exited the main entrance, she was immediately faced with the dead body of John Gatluak—a dear friend and colleague. The horror of finding her murdered friend remains with her to this day.

81.     Jane Doe was eventually loaded into a vehicle with other aid workers, driven away from the compound, and released from custody.

82.     The Government devastated Jane Doe's health and career. The attack inflicted severe physical injury and pain on her, along with intense trauma, fear, and anguish. Her physical injuries lasted long after the attack, requiring intensive behavioral and physical therapy. To this day, she suffers severe post-traumatic stress disorder, with anxiety and somatic symptoms.

83.     At the time of the Terrain Attack, Jane Doe was a thriving international development professional and manager. The primary and secondary trauma inflicted on her by Defendants and their subordinates destroyed her career, leaving her partially disabled and severely limited in her ability to work.

84.     The Government inflicted further trauma on Jane Doe through its demeaning and deceptive handling of the court martial and its protracted and futile compensation negotiations.

**G. Mary Roe's ordeal.**

85.     During the attack, Mary Roe hid in a bathroom with a colleague of hers, placing a laptop on her head to protect herself from the raining bullets coming through the ceiling from soldiers on the roof. Four soldiers made their way to Mary's room and her hiding spot in the bathroom. They violently pulled her out of the bathroom, bruising her arms badly. Pushing her around, the attackers demanded cash and her laptop and phone, and that she gather all the laptops and electronic items she could find in a bag for them.

86.     One uniformed attacker forced his hand under Mary's shirt and grabbed her breast. He slapped her when she tried to stop him. He then aimed his AK-47 at Mary's chest and cocked it. She feared she was about to be executed. He said to her: "Are you ready to die?" The attacker smiled and ordered Mary to go to the bathroom with him. She feared he was going to rape her. He pulled her violently and she fell to the floor. She was bruised all over.

87.     A male colleague of Mary's was pinned on the floor next to her. An attacker held an AK-47 to his head and threatened death. The attacker shot right next to the male colleague's head, performing a mock execution right before Mary. She fled back to her bathroom hiding spot, shaking uncontrollably, with her hands over her ears to block the sound of screaming and shooting. Another attacker saw her and aimed an AK-47 at her.

88.     The first wave of attackers had already looted everything valuable when a second group of soldiers entered the room. They ordered Mary's male colleagues out of the building and the women to stay inside. Fearing that the attackers were separating the women to rape them, Mary ran to open the glass door of the balcony and jumped out, falling two stories to the ground and hitting razor wire on her way down. Mary's fall resulted in lacerations all over her body and she sustained serious injuries to her shoulder.

89.     From the ground, she saw more soldiers walk towards the building, firing gunshots into the air. Afraid they would find her, she crawled to a tree 50 meters away. The tree was next to a concrete fence separating the Terrain Hotel from another private area. Mary climbed the tree and jumped to the other side of the fence, again falling hard on the ground on her right shoulder.

90.     Mary remained in hiding outdoors until early the next morning, when she returned to the safe house building and saw the dead body of John Gatluak lying on the ground.

91.     The Government devastated Mary's health and shattered her sense of well-being. The attack inflicted severe physical injury and pain on Mary, along with intense trauma, fear, and anguish. Her physical injuries lasted long after the attack, causing severe pain to this day. She continues to undergo psychological treatment and physiotherapy for her injured shoulder. She continues to suffer severe post-traumatic stress disorder, which has limited her ability to work and impacted her career as an international development professional.

92.     The Government inflicted further trauma on Mary through its demeaning and deceptive handling of the court martial and its protracted and futile compensation negotiations.

### H. John Gatluak's ordeal.

93.     John Gatluak was a South Sudanese reporter working for the American NGO Internews under a USAID contract. John was visiting Terrain when Government forces stormed the compound. He hid in a room as soldiers began ransacking the apartments. Eventually, he bolted into the hall, trying to escape but was caught by soldiers. They threw him to the ground, beat him with rifle butts and fists, and dragged him away.

94.     John was forcibly marched outside, a rifle held to his head. As John stood with his arms raised, a soldier fired two bullets into his head at point-blank range. He fired four more shots into John's body after he fell to the ground.

95.     John's wife Rebecca was pregnant with the couple's third child at the time of the attack. The stress and trauma of the news of John's death forced Rebecca into premature labor. She gave birth to their third child just one day after the incident.

96.     Rebecca and her children have suffered, and will continue to suffer, pain and mental anguish as a result of John's death. Rebecca and her children were also financially dependent on John and have been severely disadvantaged by his death. Rebecca is a survivor and will rebuild; she requires compensation to do so.

97.     The Government inflicted further trauma on Rebecca through its demeaning and deceptive handling of the court martial and its protracted and futile compensation negotiations.

**I.   Gian Libot's ordeal.**

98.     During the attack, Gian took shelter in the same room as Jane Doe. He hid under a bed, arranging suitcases to prevent the soldiers from seeing him. Eventually, a group of soldiers burst into the bedroom. They found Jane Doe hiding in the corner of the room and began demanding cash and valuables from her. Gian saw a soldier get on top of Jane Doe and start to assault her. He looked away to protect her privacy.

99.     As the soldiers continued to ransack the room, they eventually found Gian under the bed. A soldier aimed his AK-47 at Gian and ordered him to get up. As he crawled out and tried to stand, the soldier slammed the butt of his rifle hard onto Gian's back. The

soldiers forced Gian at gunpoint to search for valuables: he feared he was about to be executed. Finding his bag, he gave his laptop to the soldiers.

100.    After several minutes, the soldiers led Gian outside the building and forced him to gather in a semi-circle with a group of other captives. The soldiers began taunting them: one of the kneeling victims near Gian was struck in the head with an AK-47. One of the soldiers berated the Internews employees and other captives about the purported evils of the U.S. government, the United Nations, and other foreigners: "You messed up the country. You're helping the rebels." The soldiers threatened the captives that they would be killed and made an example of.

101.    At this point, John Gatluak was marched out of the building by soldiers and summarily executed. Gian was terrified by the murder of his friend, right before his eyes. He feared that he and the other captives would be next.

102.    Eventually, a soldier told the group of captives that the raid was over. Gian and several others were loaded onto a jeep, taken away from the compound, and released.

103.    Gian endured severe fear and emotional distress during his ordeal, fearing that at any time he would be murdered, and being forced to observe the assault on Jane Doe and the summary execution of John Gatluak. Gian suffers from severe anxiety and post-traumatic stress disorder as a result of the attack: years later, the attack still takes a toll on his personal relationships, his professional success, and his health.

104.    The Government inflicted further trauma on Gian through its demeaning and deceptive handling of the court martial and its protracted and futile compensation negotiations.

### J. The Government orders the halt of the Terrain Attack only after the United States urges it to act.

105.    The occupants of the Terrain Hotel made frantic calls for help to the U.N. Mission in South Sudan peacekeeping force and to the U.S. Embassy in Juba. According to U.S. Ambassador Samantha Power, the U.S. Embassy responded to the distress calls from the compound and "urgently contacted South Sudanese government officials, who sent a response force to the site to stop the attack."[16]

106.    At or around 6:30 pm—three hours after the onset of the attack—South Sudan sent members of the NSS into the Terrain Hotel to call off the attack. They loaded aid workers into cars in two waves, without explaining what was going on. The captives feared they were being led to their deaths, only realizing later that the ordeal was over.

---

[16] NBC News, U.S. Embassy Says It Responded to Brutal Attack on Foreigners in South Sudan, Aug. 16, 2016, https://www.nbcnews.com/news/world/u-s-embassy-says-it-responded-brutal-attack-foreigners-south-n632261.

107.   The Government "rescuers," however, left Irene and Mary and dozens of other survivors behind. They would not be evacuated until the following morning, when a private security contractor—not the Government—came to her rescue.

## III.   The Government admits fault in two fact-finding missions and a court martial.

### A.  South Sudan's official Investigation Committee and a United Nations mission both pin the attack on the Government.

108.   In August 2016, President Kiir appointed a governmental Investigation Committee to examine the Terrain Attack. The Committee was formed pursuant to the Investigation Committees Act, 2006, and vested with subpoena powers and the ability to issue arrest warrants.[17] In the course of a 21-day investigation, the Committee "interviewed over 60 witnesses," "obtained oral, written, and documentary evidence," inspected the crime scene, and made several arrests.[18]

109.   The Committee issued its final report on October 26, 2016, concluding that Government forces were responsible for the murder of John Gatluak, the rape and beatings of international aid workers, and the destruction and looting of property.[19] The Committee observed physical evidence of the atrocities at the crime scene, finding "traces of blood all over

---

[17] Exhibit B, Investigation Committee on Terrain Hotel Incident of 11th July 2016, Final Report Submitted to H.E. General Salva Kiir Mayardit, President of the Republic, Oct. 25, 2016, at 4-5.
[18] *Id.* at 11.
[19] *Id.* at 27.

the room"[20] and rooms "littered with women pants (under wears) and other exhibits that indicate that the rape was violent."[21]

110.   The Committee's Final Report confirmed that the attackers were indeed members of the SPLA (including the Tiger Division), the NSS and the police force.[22] According to the report, "[t]he fact that the location of Terrain is at outskirts of Juba City, and was a no go area for anyone at that time other than soldiers, gave the offenders an opportunity to perpetrate their unlawful acts with impunity."[23]

111.   The Committee also found that the "root-causes" of the attack lay in the military's lack of adequate training, supervision, compensation, and psychological services. The government's Committee found that the Terrain Attack was part of "a growing trend of indiscipline within the ranks and file of the army and this is attributed to various factors including economic, recruitment procedures, training, commissioning, promotion, deployment and psychological."[24] The "bulk of the forces" were not given "comprehensive training," were subjected to a "living condition intolerable for low income members of society."[25] The Committee concluded that "[t]he meager salary paid to soldiers and its irregular

---

[20] *Id.* at 30.

[21] *Id.* at 19.

[22] *Id.* at 24.

[23] *Id.* at 27.

[24] *Id*. at 33.

[25] *Id.* at 34.

payment has forced some of the soldiers to seek unlawful means of providing for themselves and their families."[26] Finally, the Committee concluded that the government failed to address psychological disorders among the armed forces:

> The psychological impact on soldiers who have spent most of their lives fighting bloody wars has not been taken care of. These categories of soldiers require counseling services to be offered to them so as to address their psychological and mental feelings.[27]

112.     South Sudan also admitted responsibility for the Terrain Attack to the United Nations. On August 23, 2016, the U.N. Secretary-General established an Independent Special Investigation to examine, among other incidents, "the attack on Terrain camp, a private compound where U.N. personnel, aid workers and local staff were robbed, beaten, raped, and killed by armed soldiers."[28] The Special Investigation's report concluded: "Government soldiers also perpetrated the attack on Terrain camp, a charge the Government did not dispute in a 15 September meeting with the Special Investigation team."[29]

---

[26] *Id.*

[27] *Id.*

[28] Exhibit C, Executive Summary of the Independent Special Investigation into the violence which occurred in Juba in 2016 and UNMISS response, at 1.

[29] *Id.* at 3.

**B.  The SPLA General Court Martial finds the Ministry of Defence responsible for the attack and civilly liable to compensate the victims.**

113.    Acting on the recommendation of the Investigation Committee, the Government constituted a special military court martial to prosecute perpetrators of the attack.

114.    At the Government's invitation, Plaintiffs and other victims participated in the court martial as civil parties and witnesses, providing written and oral testimony. Out of safety concerns, only one victim of sexual violence agreed to testify in person. With the assistance of the FBI, Natalie, Irene, Jeana, Mary, and Gian were able to testify remotely via satellite-link from the United States. Jane Doe provided written testimony via the FBI.

115.    On September 6, 2018, the SPLA General Court Martial rendered a judgment convicting 10 "SPLA personnel" of "murder, criminal trespass, theft after preparation made for causing death, hurt or restrain in order to facilitate the committing of the theft, house breaking, Sexual harassment [sic], rape, [and] Assault [sic]."[30]

116.    The court martial further held that the Government was civilly liable to the victims:

> The Government of South Sudan's Ministry of Defense has to pay a compensation for grievous hurt an [sic] amount worth United States Dollars

---

[30] Exhibit A, Government of South Sudan/Sudan People's Liberation Army vs. S/M/ Abraham Agany Tiah Dhuor et al., Judgment, Criminal Case No. 135/2017, SPLA General Court Martial, at 3.

Fourth Thousand (US $ 4,000) each for Five (5) victims to sum up to United States Dollars Twenty Thousand (US $ 20,000); recoverable in civil suit as **enshrined by section 7 Code of Civil Procedures Act, 2007**.[31]

117.    The Terrain Hotel owners were awarded $2.25 million in damages. The five testifying victims of sexual assault and rape—including Natalie, Irene, and Jeana—were awarded a meager $4,000 each. The court martial ordered the payment of "[f]ifty One (51) heads of cattle to the heirs of the deceased person John Gatluak Manguet"—Plaintiff Nygundeng and her children.[32]

118.    As one ground for the decision, the court martial observed:

The nature of these crimes are continuously been committed by the SPLA soldiers without any deterrent punishment that to create a high discipline within the SPLA soldiers in order to warn all that like-minded with them, and to prevent a repetition of wrong-doing by disablement of the accused persons (**stripping of the ranks, dismissal from the SPLA active force, payment of loss and damages cost, payment of customary blood compensation, and imprisonment**). [sic][33]

119.    Plaintiffs, through local counsel in South Sudan, appealed the damages portion of the judgment on the grounds that $4,000 and 51 cows are incommensurate with the depravity of the crimes and the physical and mental trauma they endured.

---

[31] *Id.* at 1 (emphasis in original).

[32] *Id.* at 2.

[33] *Id.* at 3.

IV.   **The Government thwarts the victims' efforts to seek justice and fair compensation.**

   A.  **The Government spoliates evidence and obstructs an appeal.**

120.   Having induced the victims to pursue legal remedies in South Sudan, the Government then obstructed Plaintiffs' appeal of the damages order through spoliation. In or around September 2019, Plaintiffs learned that the Supreme Court of South Sudan was unable to hear their appeal because the case file—the entire record of evidence and rulings—had suspiciously disappeared after being transferred to the custody of the office of the President of the Republic. To date, the Government has not produced the missing case file, offered any explanation for its disappearance, or remedied in any way its intentional or grossly negligent loss or destruction.

   B.  **After destroying the case file, the Government induces the victims to negotiate out of court, strikes a deal with a fraudster, and then fails to make good on promises to pay.**

121.   Defendants used this spoliation of evidence to their advantage. From the fall of 2019 through June 2021, Defendants induced the Plaintiffs and other victims to engage in informal negotiations to determine the amount of compensation owed to them by the government, pursuant to the court martial's imposition of civil liability on the Ministry of Defence. Defendants represented to Plaintiffs—and to the U.S. government—that Defendants were committed to compensating the victims.

122.    Plaintiffs reasonably relied upon the government's statements of intent to resolve the matter outside the courts, particularly in light of U.S. government efforts to monitor South Sudan's progress in reaching a just resolution.

123.    South Sudan, however, has repeatedly negotiated in bad faith and has misled the Plaintiffs into believing that the government would pay compensation once an agreement was reached. The government's misconduct has put the lie to that belief.

124.    In December 2019 and January 2020, the Government negotiated a fraudulent "settlement" with local lawyers from the "Pan African Law Chambers" ("PALC"), who had never been retained by Plaintiffs. Despite being aware of the fraud, the Government persisted in attempting to bind Plaintiffs to the fraudulent terms secured by Defendants without Plaintiffs' knowledge or consent. On June 16, 2020, the Government transmitted a letter to Thomas J. Hushek, U.S. Ambassador to South Sudan and Issa Muzamil, victims' counsel in the court martial proceedings. The June 16 letter accused the victims of "avoiding the current out of court settlement process by engaging and disengaging lawyers from different jurisdictions."[34] The letter falsely stated that the four claimants (including Natalie, Irene, and Jeana) attended a January 2020 meeting between the Government and PALC. Plaintiffs attended no such meeting. The letter went on to say: "The Government of South Sudan

---

[34] Exhibit D, July 7, 2021 Letter of Rescission, at 4.

remains committed to the out of court settlement on the basis of legal principles involved and intends to proceed on the basis set out therein."

125.    In the summer of 2020, the Government informed the victims that it would first compensate four of the victims of sexual violence and then compensate the remaining victims. Retraumatized by the Government's treatment of the victims, Irene relented to the Government's pressure. On August 14, 2020, Irene informed the Government that she accepted its offer of $500,000 in compensation, believing it futile to seek compensation commensurate with her pain and suffering and economic losses. On September 16, 2020, Natalie and Jeana informed the Government that the terms secured by the Government through fraudulent negotiations were unacceptable and that further negotiations were required. The Government has continued to engage with the victims' local counsel in compensation negotiations.

126.    However, nearly one year after Irene transmitted her acceptance of the Government's offer, the Government has failed to pay Irene any of the compensation it promised. On July 7, 2021, Irene informed the Government that, due to the Government's failure to perform timely on its promise, her acceptance was rescinded.[35]

---

[35] *Id.* at 1.

127.    To date, despite its repeated commitments, the Government has not compensated any of the victims of violence. Inexplicably, the government promptly paid more than $2 million to the owners of the Terrain Hotel for lost property and earnings, but nothing to victims of gang-rape, torture, and murder.

**V.    South Sudan waives immunity and consents to this lawsuit.**

128.    Realizing that that South Sudanese Government had lured the victims into protracted and futile negotiations, without making good on promises to pay, Plaintiffs informed the Government of their intent to bring claims in the United States. On Monday, March 22, 2021, the undersigned counsel for Plaintiffs delivered a demand letter and draft complaint, via WhatsApp, to Counsel Biong Pieng, Advocate General of South Sudan in the Ministry of Justice.  Counsel Pieng is the chief negotiator for South Sudan in this case and an experienced litigator, representing the Government in domestic and international legal proceedings. Counsel Pieng confirmed receipt of the delivery via WhatsApp on March 22, 2021 at 1:51pm EDT, stating "Okay, well received."

129.    Plaintiffs' draft complaint, which Counsel Pieng received, specifically alleged that South Sudan had waived its immunity through its assumption of liability, pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(1).

130.    On or around April 6, 2021, after receiving this draft complaint, Counsel Pieng

informed Plaintiffs' local counsel in South Sudan that the Plaintiffs should bring their claims

so that the case can be resolved.

131.    On or around June 25, 2021—three months after receiving the draft complaint

and Plaintiffs' assertion that South Sudan had waived immunity and consented to suit—the

Legal Adviser to the President of South Sudan reiterated to Plaintiffs' local counsel that

Plaintiffs should bring their claims.

132.    South Sudan's repeated invitation for Plaintiffs to bring their claims, in

response to Plaintiffs' demand letter, constitutes a waiver of sovereign immunity under the

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(1). Pursuant to the South Sudanese

Government's expressed consent to the filing of this action, Plaintiffs now bring the following

claims for damages.

## GENERAL ALLEGATIONS

**I.    Equitable estoppel and tolling.**

133.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

134.    Defendants are equitably estopped from asserting the running of any statute of

limitations from at least August 2016 until June 25, 2021. Equitable estoppel "prevents a

defendant from asserting untimeliness where the *defendant* has taken active steps to prevent

the plaintiff from litigating in time." *Charles v. Brennan*, 174 F. Supp. 3d 97, 102 (D.D.C. 2016)

(quoting *Currier v. Radio Free Eur./Radio Liberty, Inc.*, 159 F.3d 1363, 1367 (D.C. Cir. 1998); *see also Breen v. Peters*, 529 F. Supp. 2d 24, 26 (D.D.C. 2008), *on reconsideration for other grounds* (recognizing fact that adversary is a sovereign "is no bar to the application of equitable tolling principles").

135.    Defendants took active steps to prevent Plaintiffs from litigating their claims. First, beginning in or around August 2016, Defendants encouraged Plaintiffs to pursue legal avenues in South Sudan through the Investigation Committee and court martial. Then in the fall of 2019, Defendants spoliated the case file and obstructed Plaintiffs' appeal of the damages order. To date, Defendants have failed to pay even the meager amount initially ordered by the court martial.

136.    Second, Defendants again took active steps to prevent Plaintiffs from litigating their claims from the fall of 2019 through June 25, 2021 by inducing Plaintiffs to engage in bad-faith settlement negotiations. Plaintiffs reasonably relied on Defendants' representations to Plaintiffs' counsel—and to U.S. diplomatic officials—that the Defendants would conduct a good-faith claims settlement process. Instead, Defendants have dragged their feet for years, struck a deal with an attorney who did not represent the Plaintiffs, and then tried to foist that deal on Plaintiffs and other victims throughout the summer of 2020. Nearly one year after Irene accepted the Government's offer, the Government has failed to perform on its promise

to pay. It is clear that the Government misled Plaintiffs and had no intention of compensating them.

137.    Plaintiffs' diligent efforts to seek remedies since 2016 have been thwarted by this misconduct and by the dysfunctionality of the South Sudanese legal proceedings. In addition to equitable estoppel, these extraordinary circumstances warrant equitable tolling of Plaintiffs' claims. *See, e.g.*, *Young v. United States*, 535 U.S. 43, 50 (2002) (tolling warranted where complainant has been "induced or tricked by his adversary's misconduct").

## II.    Respondeat superior.

138.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

139.    At all relevant times, the soldiers who injured Plaintiffs were agents of the Government, acting under the control of the Ministry of Defence and within the scope of their employment. *First*, Defendants selected and recruited the soldiers, paid their wages, armed and equipped them, directed their conduct in a chain of military command, and permitted looting and criminality as a form of reward. *Second*, Defendants exercised control over their agents by ordering them to cease their raid on the Terrain Hotel upon the request of the United States government. *Finally*, the Terrain Attack was a military operation and a foreseeable outgrowth of Defendants' pattern and practice of using sexual violence and the terrorization of civilians as a weapon of war. Defendants' principal/agent relationship with the perpetrators makes

Defendants liable under the doctrine of *respondeat superior*. *See, e.g.*, *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985).

140.   Alternatively, even if Defendants' soldiers were deemed to have acted outside the scope of their employment, Defendants breached their duty to exercise reasonable care to control their agents and prevent them "from intentionally harming others," as was entirely foreseeable. *Restatement (Second) of Torts* § 317 (1965).

141.   At all relevant times, Defendants' soldiers were using Defendants' chattel to attack Plaintiffs, and Defendants knew or had reason to know that they "had the ability to control" Plaintiffs' attackers—they maintained a hierarchical chain of command. Defendants also knew or should have known of "the necessity and opportunity for exercising such control"—they were aware of and, in fact, fostered a growing trend of criminal indiscipline in the ranks.

## COUNT ONE

### ASSAULT (ALL PLAINTIFFS)

142.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

143.    Common law assault is defined as "the unlawful use of force causing injury to another or the attempt to cause injury with the present ability to do so." *Mungo v. United States*, 772 A.2d 240 (D.C. 2001). "[T]hreatening behavior accompanied by an intent to frighten the victim" and "sexual touching" are also recognized forms of assault. *Id*.

144.   The atrocities committed against Plaintiffs are an extreme form of assault rising to the level of torture: "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1). Torture is an act of terrorism under U.S. law. *See* 18 U.S.C. § 2332b; 28 U.S.C. § 1605A(h)(7). Torture constitutes assault because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).

145.   Natalie, Irene, Jeana, Jane, Mary, Gian, and decedent John Gatluak were tortured by Defendants' agents and subjected to the unlawful use of force causing injury and attempts to cause injury with the present ability to do so.

146.   Natalie, Irene, Jeana, Jane, and Mary were also subjected to non-consensual sexual violence by Defendants' agents, involving harmful and offensive physical contact.

147.   While in Defendants' custody and control, the victims were frequently threatened with harmful and offensive physical contact, including death. These threats proximately caused the victims to experience imminent apprehension that they could be killed, tortured, raped, abused, or otherwise physically and emotionally injured. They constantly feared for their health and safety.

148.    Defendants' agents inflicted terror and mental suffering on John Gatluak as he was led to his death by summary execution, entitling Rebecca and her children to survival damages as his lawful heirs.

## COUNT TWO
### BATTERY (ALL PLAINTIFFS)

149.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

150.    A defendant is subject to liability to another for battery if it caused "an intentional, unpermitted, harmful or offensive contact with his person or something attached to it." *Dammarell v. Islamic Republic of Iran*, No. 01-2224, 2006 WL 2382704, at *26 (D.D.C. 2006) (citing *Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978)).

151.    Torture is one of the most extreme forms of battery, 18 U.S.C. § 2340(1), and is an act of terrorism under U.S. law. *See* 18 U.S.C. § 2332b; 28 U.S.C. § 1605A(h)(7).

152.    Defendants' agents subjected Natalie, Irene, Jeana, Jane, Mary, Gian, and decedent John Gatluak to harmful and offensive contact amounting to torture, including rape and other forms of sexual violence, beatings, being forcibly moved at gunpoint, and, in the case, of John Gatluak, being shot to death.

153.    The acts alleged herein proximately caused Plaintiffs to suffer severe physical and or mental suffering as well as economic loss.

154.     In addition, Rebecca and her children are entitled to survival damages for the pain and suffering inflicted upon John Gatluak prior to his death.

## COUNT THREE

### Wrongful Death (Rebecca Nygundeng)

155.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

156.     An actor is liable for wrongful death if that actor's wrongdoing caused the deceased person's death and a surviving spouse, child, or other beneficiary has suffered damage or loss as a result.

157.     Defendants' agents deliberately and maliciously killed Rebecca's husband, John Gatluak.

158.     Defendants are obligated to compensate Rebecca and her children M., E., and G. for the damages and losses caused by the loss of their spouse and father.

## COUNT FOUR

### Intentional Infliction of Emotional Distress
### (All Plaintiffs)

159.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

160.     An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for that emotional harm. *Competitive Enter. Institute v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016); *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 53 (D.D.C. 2019). Extreme and outrageous conduct is that which

is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013).

161.    Defendants' agents deliberately inflicted beatings, sexual violence, and lethal shooting amounting to torture.  Torture is an act of terrorism under U.S. law. *See* 18 U.S.C. § 2332b; 28 U.S.C. § 1605A(h)(7). "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Acts of terrorism—such as torture— are therefore "sufficiently outrageous and intended to inflict severe emotional harm" to impose liability on foreign sovereign defendants. *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39(D.D.C. Mar. 1, 2016) (quoting *Heiser*, 659 F. Supp. 2d at 27).

162.    Defendants' conduct in attacking the Terrain Hotel caused Plaintiffs to suffer severe emotional distress, including depression and symptoms of post-traumatic stress disorder, with devastating financial and professional consequences.

163.    In addition, Rebecca and her children are entitled to survival damages for the emotional distress inflicted upon John Gatluak in the time leading to his death.

## COUNT FIVE

### NEGLIGENT RETENTION, TRAINING, AND SUPERVISION
### (ALL PLAINTIFFS)

164.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

165.    An employer is liable for negligent supervision when the "employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d at 613.

166.    An employer is also liable for negligent retention if it fails "to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 431 (D.C. 2006).

167.    Defendants' own Investigation Committee found that Defendants knew or should have known that its soldiers had a propensity to commit violence and looting against civilians and failed to properly train or supervise its armed forces to prevent such misconduct.

168.    Plaintiffs and decedent John Gatluak were injured as a direct and proximate result of Defendants' negligent retention, training, and supervision of the soldiers who attacked the Terrain Hotel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

169.    Defendants are jointly and severally liable for compensatory damages for pain and suffering and economic loss.

170.    Natalie Chang is entitled to approximately $15 million USD for pain and suffering and $8 million USD in economic damages and lost earnings, or to a greater amount to be proven at trial. *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 184 (D.D.C. 2019) (awarding American victim of Iranian torture $15,440,000 in damages for pain and suffering and $8,407,267 in economic damages).

171.    Irene Scott is entitled to approximately $15 million USD for pain and suffering and at least $8 million in economic damages or lost earnings, or to a greater amount to be proven at trial.

172.    Jeana Graham is entitled to approximately $15 million USD for pain and suffering and $8 million USD in economic damages and lost earnings, or to a greater amount to be proven at trial.

173.    Jane Doe is entitled to approximately $15 million USD for pain and suffering and $8 million USD in economic damages and lost earnings, or to a greater amount to be proven at trial.

174.   Mary Roe is entitled to approximately $15 million USD for pain and suffering and $8 million USD in economic damages and lost earnings, or to a greater amount to be proven at trial.

175.   Gian Libot is entitled to approximately $5 million USD for pain and suffering and $3 million USD in economic damages and lost earnings, or to a greater amount to be proven at trial. *See, e.g.*, *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 184 (D.D.C. 2019) (awarding $3,125,000 to victim of emotional distress who, unlike Plaintiff Libot, was not physically present or threatened).

176.   Rebecca Chol Nygundeng is entitled to approximately $12 million USD for loss of companionship and protection as well as pain and suffering, and each of her three children are also entitled to $12 million for loss of protection and pain and suffering, or to a greater amount to be proven at trial, for a total amount of $48 million. *See Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 157 (D.D.C. 2017) (awarding $12.5 million and $17 million respectively to the widows of two men, one shot in the street and the other tortured then killed); *Bakhtiar v. Islamic Republic of Iran*, 571 F. Supp. 2d 27, 38 (D.D.C. 2008) (awarding $12 million in damages to widow for assassination of husband); *Higgins v. The Islamic Republic of Iran*, No. 1:99CV00377, 2000 WL 33674311, at *9 (D.D.C. Sept. 21, 2000) (awarding $12 million each to wife and daughter of victim held captive for 529 days before being killed).

Dated:        July 8, 2021

_____/s/ Scott A. Gilmore_____
Scott A. Gilmore (D.C. Bar 1002910)
HAUSFELD LLP
888 16th Street N.W.
Suite 300
Washington, DC 20006
202-540-7147
sgilmore@hausfeld.com

James Gotz (pro hac vice pending)
HAUSFELD LLP
One Marine Park Drive
Suite 1410
Boston, MA 02210
617-207-0600
jgotz@hausfeld.com

Jeanette Bayoumi (D.C. Bar 1021055)
HAUSFELD LLP
33 Whitehall Street
14th Floor
New York, NY 10004
646-647-1281
jbayoumi@hausfeld.com